Henry J. Umentum and Lydia Umentum v. Commissioner. Henry J. Umentum v. Commissioner.
Umentum v. Commissioner
Docket Nos. 63452, 63453.
United States Tax Court
T.C. Memo 1959-211; 1959 Tax Ct. Memo LEXIS 39; 18 T.C.M. (CCH) 1020; T.C.M. (RIA) 59211; October 30, 1959
*39 Held: Fraud with intent to evade tax not proved. Additions to tax under sections 291(a), 294(d)(1)(A) and 294(d)(2), I.R.C. 1939, approved. Respondent's determination of estimated living expenses found to be correct absent sufficient evidence to overcome presumption of correctness. Melvin W. Dewane, Esq., 604 Bellin Building, Green Bay, Wis., for the petitioners. James T. Wilkes, Jr., Esq., and Delman H. Eure, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined deficiencies in income tax and additions to tax for the taxable years and in the amounts as follows: Additions to Tax, I.R.C. 1939
Sec.
Sec.
Sec.
Year
Deficiency
291(a)
294(d)(1)(A)
294(d)(2)
Sec. 293(b)
1944
$4,752.74
$ 4.44
$2,376.37
1945
2,807.26
172.16
1,403.63
1946
4,180.16
247.69
2,090.08
1947
3,986.86
238.43
1,993.43
1948
6,694.15
$612.65
408.43
3,347.08
1949
1,523.21
$152.32
137.09
91.39
761.61
1950
9,178.03
917.80
826.02
550.68
4,589.02
1951
4,461.06
448.56
299.04
2,230.53
*40 The issues for decision are: 1. Whether all or any part of the deficiencies in income tax for the years 1944 through 1951 is due to fraud with intent to evade Federal income taxes. 2. Whether additions to tax should be imposed in respect of each of the years involved: (a) For failure to file timely income tax returns; (b) for failure to file declarations of estimated taxes; and (c) for substantial underestimate of estimated taxes. 3. Whether petitioners incurred living expenses in each of the taxable years in the amounts determined by respondent. Findings of Fact The stipulated facts are found as stipulated and are incorporated herein by this reference. Henry J. Umentum, hereafter called petitioner, and Lydia Umentum, husband and wife, were residents of Green Bay, Wisconsin, at the time of trial. Petitioner filed individual income tax returns for the years 1944 through 1950, and petitioner and his wife filed a joint return for the year 1951 with the collector of internal revenue at Milwaukee, Wisconsin. Petitioner was born and raised in the Town of Bellevue, a farming community in Brown County, Wisconsin. His father, who was foreign born, was a farmer who also bought, *41 sold and rented cattle. Petitioner's mother died when he was 7 years old. He had attended a country school for 1 or 2 days a week for 3 years, but after his mother died he quit school to accompany his father as he rode about the countryside buying, selling and renting out cattle to the farmers. At the age of 12 he began buying calves from neighboring farms. During succeeding years, while operating a farm with his father, he continued to buy cattle, place bulls and rent cows to farmers. Thus at a tender age petitioner's education and experience were limited to dealing with cattle. Petitioner married at the age of 22 and bought his father's farm. One year later he returned the farm to his father as he could not operate it successfully. In 1939 or 1940, petitioner's first wife obtained a divorce. At this time the only inventory ever taken of petitioner's cattle was made in order to ascertain his assets. The inventory disclosed that he owned 476 head of cattle, which were placed with some 250 farmers in seven Wisconsin counties. Petitioner married his present wife, Lydia, in 1941, and since that time, with the exception of a short time in the Army in 1942, petitioner has owned and *42 operated a dairy farm with the aid of his wife and custom-hired labor, while continuing to trade and rent out cattle. In 1943 and 1944, petitioner owned an estimated 600 to 650 cows and bulls. The cows which petitioner purchased had cost him from $25 to $40 a head. Not all were purchased, however, as some were received as calves from farmers in lieu of rent on cows owned by petitioner. After the war cattle prices rose sharply to a range of $190 to $210 a head. Petitioner reduced his herd substantially at this time, realizing a large profit. During the years 1941 through 1951, petitioner was a party to some 30 real estate transactions, many of these being mortgage transactions to secure loans which friends of petitioner had pressed him to make. In 1948, petitioner built a packing plant at an approximate cost of $35,000. This project resulted in a complete failure. During the years 1943 through 1951, petitioner maintained for varying periods a total of 29 bank accounts. Twenty-eight of these were kept during the taxable years here in issue. These accounts included savings accounts, checking accounts, Christmas accounts and certificates of deposit. Petitioner is illiterate *43 and did not learn to sign his name until he was 20 years of age. While in the Army for a period of a month and 11 days in 1942, he paid others to write letters to his wife and relied upon others to read his wife's letters to him. He kept no written records of the location of the cattle which he rented out. Despite his inability to make and keep records, he was able to keep track of these cattle from memory. He could recognize his own cows in a farmer's herd upon sight. However, from time to time petitioner forgot where he had rented cows; and farmers, knowing that he kept no written record of his rentals, would sell cattle owned by petitioner and keep the proceeds. Disputes arising over cattle caused petitioner to be a party to a number of lawsuits over the years. Petitioner received no newspapers into his home and his only use of the radio was to listen to the noon cattle-market reports from Milwaukee. In the early 1940's a banker in Green Bay, Wisconsin, told petitioner that he should make out a Federal income tax return and pay any tax shown to be due. The banker wrote out on a piece of paper some information concerning the tax, which petitioner took home to his wife who could *44 read and write. For several years the banker made out petitioner's income tax returns from information given to him by petitioner. The returns for the years 1946 through 1950 were prepared by an attorney. Petitioner had no records other than milk statements and his checkbooks. Most of the figures given to the banker and later to the attorney were estimates. Unreported were large amounts of income from sales of cattle to various packing companies and individuals, sales to cheese factories and items of interest from savings accounts and mortgages. Neither the banker nor the attorney went over the returns with petitioner, but merely told him to sign the form. The 1951 return was prepared by a different attorney who told petitioner that his method of reporting income and deductions was wrong, and that he would have to keep records. Petitioner's income for the taxable years in question, as reflected by respondent's net worth determination, totaled $136,380.39. During this same period, petitioner's tax returns reported income of $6,237.01. Petitioner incurred living expenses in each of the years 1944 through 1951 as follows: 1944
$1,600
1945
1,800
1946
2,000
1947
2,200
1948
2,400
1949
2,400
1950
2,400
1951
2,400
*45 No part of the deficiencies in income tax for the taxable years in issue was due to fraud with the intent to defeat and evade Federal income taxes. Petitioner's failure to file an estimate of taxes for the years 1948, 1949, 1950 and 1951 was not due to reasonable cause but to willful neglect. Petitioner is liable under section 294(d)(2) for substantial understimation of estimated taxes. Petitioner's failure to file a return within the time prescribed by law in each of the years 1949 and 1950 was not due to reasonable cause, but to willful neglect. Opinion Respondent determined that petitioner failed to keep adequate records from which his correct income could be computed and resorted to the increase in net worth plus expenditures method for determination of the income reflected in the deficiency notice, using as estimated living expense the amounts found above. Petitioner concedes that he did not keep adequate records, and respondent's right to resort to the net worth method of computing income; nor does he dispute any of the items on the net worth computation except the living expenses. In his opening statement, counsel for petitioner indicated that petitioner did not *46 believe the figure of $12,500 used by respondent as the value of cattle inventory for all years was correct, but due to lack of records petitioner could not prove otherwise. Issue I The first issue is the question of fraud. Fraud is never to be presumed. It must be proved by clear and convincing evidence. Moreover, the burden rests on respondent. Arlette Coat Co., 14 T.C. 751. Petitioner is an illiterate cattle trader, the son of an uneducated peasant immigrant. He attended a country school for 1 or 2 days a week for 3 years, but quit school after the death of his mother in order to accompany his father who drove around the countryside buying, selling, renting and delivering cattle. Since then his whole life has been devoted to raising, renting and trading cattle. Petitioner first learned of his obligation to pay Federal income tax from a banker in Green Bay some time in the early 1940's. The banker wrote out a note about the income tax which petitioner took home to his wife who could read and write. For several years thereafter the banker prepared petitioner's tax returns for him. Beginning in 1946 an attorney prepared the forms. Petitioner has never prepared *47 his own returns. Petitioner had no records other than milk statements and his checkbooks. Other figures given to the banker and later to the attorney were mere estimates. He had nothing in writing to show for his many cattle-trading and rental transactions. Petitioner described his process of arriving at income as follows: "I told her [the wife] to look up the milk statements, and to mark them down and * * * I would start figuring in my head how much cattle we sold and how much profit we made on cows and calves, and I thought it must be about $2,000. After selling the milk, the rent, as much as I could think of, I told her to mark it down, it was about $2,200, $2,100 or $2,000." As a result, only a very small part of petitioner's true income was reported. The net worth determination reflects income for the period 1944 through 1951 of $136,380.39. Petitioner's tax returns showed income of only $6,237.01. In 1951, petitioner was told by another attorney that his method of arriving at income was wrong and that he would have to keep records in order to fulfill his obligations under the Internal Revenue Code. Respondent contends that petitioner's failure to report his true income *48 was, at least in part, due to fraud. He notes that repeated understatements of income for a period of 8 years are, of themselves, evidence of fraud, citing the decisions in Arlette Coat Co., supra, and Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6), affirming 38 B.T.A. 16. Other facts marshaled in support of respondent's argument are petitioner's successful cattle-trading activities, with volume of $15,000 to $28,000 a year; his cow-rental operation, which at one point totaled some 600 cows to 250 farmers in seven counties; his participation in lending and real estate activities and in litigation in the courts. From this evidence, respondent concludes, it is clear that petitioner was a capable businessman who was well aware of his increasing wealth and deficient tax returns. We do not agree with respondent. Granting that the evidence adduced in support of the Government's case would be sufficient against a man of ordinary knowledge and intelligence, we do not feel it proves fraud in this case. We observed petitioner on the witness stand and have taken that into consideration in deciding this issue. There is lacking one essential element *49 which goes to the heart of the fraud issue, namely, the intent to defraud by calculated tax evasion. As we said in E. S. Iley, 19 T.C. 631, 635: "Although intent is a state of mind, it is nonetheless a fact to be proven by the evidence. It must appear as a positive factor. In determining the presence or absence of fraud the trier of the facts must consider the native equipment and the training and experience of the party charged. The whole record is to be searched for evidence of the intent to defraud. * * *" We are dealing with a man who knows almost nothing about the world beyond the horizons of trading cattle and renting cows. Henry J. Umentum's world is the stockpens in Green Bay and the country roads of seven Wisconsin counties over which he drove to deliver cows. In this circumscribed world he was unquestionably skilled and competent. Yet, it should be noted that his burgeoning net worth during the taxable years involved was aided greatly by a spectacular increase in the price of cattle. In 1943 or 1944, petitioner owned some 600 cattle which he had purchased at prices ranging from $25 to $40 a head. When petitioner was reducing his herd substantially after the *50 war, prices had shot up to $190 to $210 a head. When asked why he did not report these sales, petitioner replied: "Because I had all these cattle before I had to make out the income tax papers." Respondent contends that petitioner's dealings outside his rental and trading activities indicate general business awareness, shrewdness and ability. We cannot agree. Petitioner spent approximately $35,000 to build a packing plant. This project was a dismal failure. Petitioner has been persuaded to make a number of loans to friends. These loans are of doubtful soundness. The principal on one loan of $6,500 is being repaid at the rate of only $40 per year. Petitioner's involvement in litigation has been the result, at least in part, of his inability to read, write and keep records. Farmers with whom he has rented cattle have sold them or otherwise claimed they were not petitioner's cattle. It is probable that petitioner has lost cattle over the years because he has forgotten where he rented them. For whatever probative value it may have, petitioner's Army records indicate that he was discharged after only 1 month and 11 days of service for defective vision and mental deficiency. There *51 is no evidence that petitioner attempted to conceal either his income or his assets. Substantially all of his increase in net worth is reflected in the increase in his bank accounts, mortgages receivable and real estate, all of which are easily ascertained by reference to third party or public records. Petitioner's knowledge of Federal income taxes is, at best, meager and hazy. At trial he was asked what a Form 1040, an exemption, a capital gain and depreciation were. He seemed to have no knowledge of what they meant. His returns during the taxable years in question were made out first by a banker and then by a lawyer, neither of whom raised any questions about the information petitioner submitted. But in 1951, when a different attorney prepared his return, he was told that his methods were wrong and his records inadequate. The year 1951 is also the last taxable year involved in this case. Without doubt petitioner has been grossly negligent during each of the taxable years in question. However, negligence, careless indifference, or disregard of rules and regulations do not suffice to establish fraud. An affirmative showing of the intent to evade tax is essential to the Government's *52 case. We think this case is similar to Cleveland Thurston, 28 T.C. 350, wherein we held that "the evidence is not quite adequate to support respondent's burden of proving intent to defraud." In our opinion this record as a whole does not supply the clear and convincing evidence of fraudulent intent required in a case like this. Issue II (a) Section 291(a), I.R.C. 1939, imposes an addition to the tax in case of failure to make and file a required return within the time prescribed, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner argues on brief that the 1949 and 1950 returns were not timely filed because the attorney who prepared them was busy with many returns at the time, and had to ask for extensions in order to file many of them. Nevertheless, we have no evidence that petitioner asked for or was granted such an extension. Accordingly, we hold that the failure to file a timely return for 1949 and 1950 has not been shown to be due to reasonable cause. The imposition of an addition to tax for each of said years under section 291(a) is approved. (b) Section 294(d)(1)(A) imposes an addition to the tax for *53 failure to make and file a declaration of estimated tax, unless such failure is due to reasonable cause and not due to willful neglect. Petitioner filed no declaration of estimated tax for 1948, 1949, 1950 or 1951. It is argued that petitioner merely signed the returns prepared and placed before him by the attorney. We do not regard this evidence as adequate to establish a reasonable cause for failure to file declarations, and approve the imposition of an addition to tax for each of said years under section 294(d)(1)(A). (c) Section 294(d)(2) imposes an addition to the tax for substantial underestimate of estimated tax. This Court has uniformly held that section 294(d)(2) is applicable, not only where a declaration of estimated tax has been filed and the amount of the estimate is inadequate, but also where no declaration of estimated tax has been filed, in which case the amount of the estimated tax for purposes of this section is zero. In either of these situations, the section is self-executing, regardless of excusable neglect. Further, the imposition of an addition to tax under section 294(d)(1)(A) does not bar the concurrent imposition of an addition under section 294(d)(2). *54 H. G. Irby, Jr., 30 T.C. 1166; G. E. Fuller, 20 T.C. 308, affd. 213 F.2d 102 (C.A. 10); H. R. Smith, 20 T.C. 663; Fred N. Acker, 26 T.C. 107. Issue III The final issue has to do with living expenses. Respondent has determined that petitioner incurred living expenses of $1,600 for 1944, $1,800 for 1945, $2,000 for 1946, $2,200 for 1947 and $2,400 for each of the years 1948 through 1951. Petitioner's only evidence to establish that these determinations are excessive is the testimony of petitioner's wife, who estimated generally weekly grocery bills, electricity and gas bills, and a few other expenses. On brief petitioner makes no serious argument that respondent's determinations are erroneous. We hold that sufficient evidence has not been introduced to overcome the prima facie presumption of correctness of respondent's estimates of living expenses. Decisions will be entered under Rule 50.